Good morning, Your Honors. May it please the Court, Young Park, representing appellants to people of the State of California in this matter. Your Honors, the Attorney General's antitrust action does not involve federal questions and is not preempted because it does not infringe upon FERC's exclusive jurisdiction over rates and activities that directly affect rates. This is a state law enforcement antitrust action about collusion and deception, and FERC has, FERC itself has recognized that such antitrust actions are outside of its exclusive jurisdiction. Well, the problem, it seems to me, as Judge Levy pointed out, is that the deception has to be with respect to something, and that something necessarily has to do with the transmission and sale of energy, doesn't it? It has to do with the supply that they took out of California, and our allegations are that they disguised that energy. Now, you don't need to look at the tariffs themselves to figure out if this is a deception. That may or may not be the case, but you do have to look at what kind of energy it was, don't you? Yes. Whether it was in-state or whether it was out-of-the-market, and isn't that within FERC's promise? Well, first of all, FERC doesn't, in this situation, FERC is not, I guess figuratively speaking, standing at the door of California, and when the energy is coming in, it's not making its determination that this is out-of-market or this is in-state. The way it's determined is simply when the ISO is looking for energy, if it is coming from out-of-state, that naturally is considered out-of-market energy, and if it's coming from in-state or generated from in-state and sold in that market, then that is in-state energy. How's it determined whether it's in-state or out-of-market? How's that determination made? From where the product, the energy was generated from, and so what we start out with is first the in-state market, and if in that in-state market there is not enough in-state energy, then the ISO goes to Right, but the allegation was made that PowerX was taking in-state energy and converting it artificially into out-of-market. Well, they weren't converting in the sense that Holding it until Yes, exactly. And the way they did that was simply by exporting it out-of-state and bringing it back in. But who would make that determination that those allegations were in fact true? Well, our claim is that that is, because that is something that involves more of a policing activity, that that is more appropriate for the Attorney General's office. And at the time these transactions are happening, none of that determination is going on. It's simply whatever is available for the out-of-market energy, ISO simply buys it. It doesn't make a determination of, well, is this really out-of-market energy? Where is this really coming from? The ISO is not making that determination at that time. It is simply saying that because these suppliers are coming from out-of-state, we're going to buy the energy at this time because we're in an emergency situation. As part of your complaint, though, you said that as a direct result of this manipulation that California customers were overcharged over a billion dollars. Yes. Isn't that getting into the rates? It is not getting into the rates because although we allege that, and that is actually not only background information, but also to help prove their motive, we are not saying that the higher rates that were achieved for the out-of-market energy was unreasonable. We're not asking for a hypothetical determination of what that out-of-market energy should be, or what that rate for the out-of-market energy should be. We've already accepted them as historical rates. Whatever rates were established back then for both out-of-market You're not accepting their effect on California market. Excuse me? You're not accepting their effect on the California market. Well, we're not accepting their PowerX and P&M's characterization or disguise of their energy as out-of-market. We're simply saying that because this is in-state energy, that's the rate that they should receive, the in-state rate. If you were to prevail, what would be the effect on rates? There wouldn't be any effect on rates in terms of whether there needs to be a recalculation of the out-of-market or in-state energy. Those rates stay the same. The only thing that happens is a simple differential determination, simply by saying that because they really should have been charging in-state energy, we look at the historical in-state prices that were established back then and give them that charge. Put differently, they should have been selling at a different rate. But it's not, it would be different if we said their out-of-market energy was different or was higher, and therefore they should receive a different rate for that out-of-market energy. What we're saying is more a product challenge, that this really isn't out-of-market energy. So whatever rates were established back then, they can't, this isn't out-of-market, this is in-state. Well, if that's true, then why isn't that classification within FERC's province? I mean, it seems to me one or the other, as Judge Levy said, one or the other almost has to be true. Well, it's not within FERC's province, because FERC, it's only, it's exclusive jurisdiction that Congress gave them, it's only about rate setting and rate determination. Well, how about classification of power? Well, classification of power, if it's only a direct effect on rates, would that be involved? Indirect effects on rates, which is what Schneidwin, the U.S. Supreme Court case stated, indirect effect on rates does not necessarily preempt state law. So it's something that, even though out-of-market and in-state energy might be also covered by the tariffs or covered by FERC, it's what we're trying to enforce. We're trying to enforce the deception, we're not trying to say that this is a rate setting determination that's within FERC's province. So if you're classifying the power as either in-state or out-of-market, isn't that a quintessential classification that FERC would have exclusive province to determine? No, Your Honor, just because, again, FERC has not made these determinations during this time, and the determination for them is really if this conduct is a violation of their tariffs. In other words, if it's gaming or anomalous market behavior, that's defined in the tariffs. Well, what do you do with the language, our language in E&J Gallo that specifically says that not only the rates, but the services, classifications, charges, and practices are all exclusively within FERC's jurisdiction? Yes, and that's consistent with the U.S. Supreme Court case of Nantanhala, which stated that the filed rate doctrine not only applies to rates, but also activities that directly affect rates. And I think the emphasis is on whether or not that is directly affecting rates. And so it would be, we would be in FERC's jurisdiction if we said that this classification leads to an unreasonable out-of-market or an unreasonable in-state rate. Or any. If you say if it's classified as in-state, it's one price. If it's classified as out-of-market, it's a different price. That directly affects rates, doesn't it? Well, it doesn't directly affect rates because those rates were not challenging. We're not saying that whatever those rates were for in-state or out-of-market were unreasonable. And all the cases such as Grays Harbor and Snohomish and even Waicheng that have discussed the reasonable rate challenge, all of them were about whether that particular rate was what a hypothetical. I don't understand how you have to be saying that one of the rates was unreasonably high. I mean, whatever you, California was charged was unreasonably high. That has to be the bottom line. It's unreasonably high because it's what they were getting was a different, what they were disguising was a different product. But it's not like the Grays Harbor and Waicheng case where it's unreasonable, the rate for out-of-market or the rate for in-state energy was unreasonably high. That's something that's, it's a distinction that I think is significant because, again, we're not, in those cases, because they said that, it actually required a hypothetical determination of, okay, what would a lower rate have been? Here that's, we already know what the lower rate is, which is the in-state energy that's already been established. So, there is no infringing on FERC's rate making or rate setting jurisdiction because we're not, our hypothetical would not be different than FERC's hypothetical. Furthermore, I'd like to emphasize that, unlike the other cases where the rate jurisdiction was found to be challenged, in our case, our action is a law enforcement antitrust action, and that is a significant difference because both FERC and the tariff itself has recognized that state antitrust actions such as ours can proceed in a state forum. And in fact, when we asked during a FERC proceeding, which involved some of these ricochet transactions, that FERC should also look at violations of state laws such as the antitrust laws, FERC explicitly said that it was narrowing its inquiry, or it was limiting its inquiry to only tariff violations, and that violations of state law can be pursued in the appropriate state forum. So, FERC itself has actually given us guidance of what we should do with this case, that we should litigate it in court. Moreover, the tariff itself, the tariff provision, there is an antitrust provision in that tariff that specifically says that antitrust matters can be referred to antitrust law enforcement agencies such as ours. So, there is definitely a distinction between our case and all the other cases in terms of the party involved and the action involved, because we know that even FERC has left room for this type of action, as long as we're not making a direct challenge to the rates. Counsel, what antitrust case, in your view, most strongly offers support to your position that an antitrust action is viable in this context? Well, we have cases like the first one would be California v. FPC, and the other one would be Otter Tail. Otter Tail? Yes. Well, yeah, there's no question that on the Federal side, Otter Tail indicates that power companies aren't necessarily exempt from the antitrust laws. But it's equally the case that that was for policy reasons that influenced the court, which has the ability to fine-tune the application. But the court has also indicated when that's not the case, and it seemed to me that that would be the case with respect to state antitrust law, and we've said that in Snohomish. Well, in Snohomish, in that case, that was a cartwright act, but again, there was a direct challenge to the reasonableness of the rates, the damage that they wanted. But the point being on what you're just now arguing, that we've recognized that California's enforcement of the cartwright act can be, the field can be occupied with respect to it. Well, first, Snohomish wasn't a law enforcement antitrust action like Otter Tail or our case. Secondly, Otter Tail, even though it did address the Federal antitrust... What difference does that make? Well, because the fact that it's law enforcement, I think, is significant because we are not simply like a private plaintiff just trying to get our money back. We're also, we're seeking to deter this type of... You're not seeking to get a whole bunch of money back. Yes, but a main part of our allegations is also to deter this type of conduct and also to penalize the defendants. And I think that's a significant policy reason for why law enforcement actions can proceed because there's an extra reason for why we're trying to protect the public. And furthermore, Otter Tail, even though it did involve Federal antitrust statutes, it didn't limit it. It didn't say that only Federal antitrust statutes apply. The reason why Otter Tail was talking about Federal antitrust statutes is because that was the particular complaint that was involved. And the significance of Otter Tail, though, is that it talked about the legislative history of the Federal Power Act and that it was never intended to be this pervasive regulatory scheme and that it would favor voluntary commercial relationships and maintaining competition to the maximum extent possible. Our Cartwright Act, as noted in the California case Malin v. Burkle, which analyzed the Cartwright Act, mirrors the Sherman Act. So therefore, because of that, the policy reasons are still the same. And so to distinguish it simply because ours is a state Cartwright action, I think, is a superficial distinction, especially since Otter Tail's decision was mainly about the policy of the FPA and what Congress really intended. Yeah. Well, just so it's clear, my question has to do with the policy that the Court articulated in Connell. That is, there is, in fact, a difference between Federal and state. Yes. Yes. And but I would say for this particular case where, again, it's like Otter Tail in the sense that it's a law enforcement antitrust action and that our Sherman Act or, I'm sorry, the Cartwright Act is like the Sherman Act, there really isn't a valid reason why the state action shouldn't proceed, especially when it supports the competition concern of the FPA. You mentioned that the purpose was for us to get our money back. Who's the us? It would be the people of the state of California, the people who pay the rates, the different rates for the out of mortgage. So that kind of leads into my former question. If it's the people of California and not the state of California, how do the people get it back? That's a very good question since I'm a California resident. Well, I would assume that once, if we do win this litigation, you would first make that differential calculation and then apply trouble damages and then exactly how it's dispersed to the rate payers, I'm exactly not sure. But in terms of what goes to the rate payers, it would be the trouble damages in our complaint. But that's kind of a key issue, though, isn't it? How does it get back to the rate payers? It has to be an adjustment of rates, doesn't it? Well, it would have to be an adjustment between those two filed rates. It wouldn't be like a one particular rate that's unreasonable issuing a refund. That's more of a compensatory type of remedy, whereas ours is a punitive remedy where we're simply saying get the differential and then trouble that. I'm not sure I'm understanding. How does it get back to the rate payers? Well, it would be based on what we collect based on the trouble damages. Yeah. But how do you get it back to them? I'm not sure if I. Well, the state of California is collecting trouble damages and so forth. Right. Now, how does the rate payer obviously is the one that you're trying to remedy it for. How do they get it back? I'm not sure if it's through lower electricity bills or if they get a certain type of coupon that might offset some of the. I guess my point is it affects rates. Well, it's not the direct effect on rates that we've seen in all these cases. It's not. There's no hypothetical reasoning or determination that needs to be done. That is what all these cases have been limited to when we talk about a rate determination. And we know from Schneidwin that indirect effect on rates doesn't necessarily preempt the state statutes. So if the cause of our action, if the focus is not really that the rates were unreasonable, but if it's more on, okay, what were they doing? And were they acting in collusion? And is that enough to violate the Cartwright Act? Then we have a sufficient cause of action. Now, later on, in terms of how you calculate the particular damage, as long as we're not talking about the unreasonableness of the rates, I don't think how it's necessarily brought back to the rate payers, or at least the cases that we've seen, doesn't say that that type of method would necessarily bar or preempt our cause of action. Mr. Parker, would you like to save a little bit of time? Yes. Thank you. Thank you, Judge Reimer. And may it please the Court, David Frederick for PowerX. Your question, Judge Reimer, put your finger right on the central problem of California's complaint. On the one hand, if the issue is the overcharging of rates, that's barred because that's within FERC's exclusive jurisdiction. The court in Snohomish, Grace Harbor, Dynegy, and most recently in Wauchang held that. On the other hand, if the issue is the classification of power, as Judge Rollins in your questions probed, that's also within FERC's exclusive jurisdiction, because the classification of the power is a tariff interpretation issue. The ISO tariff, which is a voluminous document, and it goes to questions of whether or not there is conduct that comports with the tariff here. And the central allegation of the complaint is that there was a jiggering of the market, if you will, in violation of those interpretations and definitions within the tariff, so that power was deemed to be out of market. Now, there's no concept in federal energy regulatory practice of in-market, out-of-market. That's solely a question of how the ISO tariff operates to control this market. And as a question of tariff interpretation, the issue is solely within FERC's exclusive jurisdiction. FERC has actually looked at the very kinds of transactions that California is asserting to be illegal here. In our supplemental excerpts of record at page three, we note where the staff has said, quote, there is no probative evidence that PowerX engaged in the illegal transactions that California is complaining about here. After the staff at FERC came to that conclusion, California brought this complaint. But California had objected in the FERC proceedings to how FERC was analyzing this problem. They raised their objections to FERC, and it was only a question of their unhappiness with the outcome that has caused them to bring the civil action that's at issue in this case. Judge Hugg, your questions about the rate and the overcharging go directly to the question of what they really want here, which is refunds. But as the Supreme Court in the ARCLA case said, courts can't pass on past charges of power without encroaching on the exclusive domain of the Federal Energy Regulatory Commission. So if what they really want is a differentiation between what was charged and what they assert to be should have been charged, for either of two reasons, that comes within FERC's exclusive jurisdiction. Now, as Judge Levy also properly held under the Dynegy case, that makes this case removable from state court, because the core question at issue here is whether or not there was a Federal interpretation that is the ingredient of the state claim. At argument here for the first time, we hear the notion that this is a different kind of action because it is law enforcement. That is a red herring, though, for a couple of reasons. First, FERC is also engaged in law enforcement. They can impose penalties and fines for illegal action for violations of tariff. This is not a criminal proceeding, as he acknowledges. It's solely to get money back. But that brings it solely within FERC's exclusive jurisdiction over rates and refunds. The Snohomish case, we think, squarely controls the question of whether the state antitrust action is barred by the filed rate doctrine, by the doctrines of field preemption and conflict preemption. He then says that because there is a state exemption in a footnote in FERC's order, and he references, I think, 1888 of FERC's order, that that somehow signals that FERC intended to allow this type of state proceeding to go forward. That's incorrect, though, because what FERC was referring to were breaches of good faith. That was the narrow category of state law that FERC thought would be permissible. It is not the kind of state antitrust actions that in Snohomish this court held would be barred by preemption and the filed rate doctrine. Unless this Court has any further questions. I have one. To the extent that the in-market, out-of-market issue is governed by the tariff or rises out of the tariff, the State argued, if I understand it correctly, that that tariff may not be valid under law here, where we had some language suggesting that FERC's review of rates, at least, at the front end but not the back end, wasn't an effective regulatory scheme. Do you have a comment on that? Sure. Let me address that in a couple of ways. First, law here reaffirmed the market-based rate regime that was applicable here. That was the first holding of the law here decision. With respect to the reports that needed to be filed, there isn't an allegation here in this complaint that I see that PowerX failed to make the kinds of reports that were at issue in law here. And in any event, that would be within FERC's exclusive jurisdiction. As the Court held, law here was a direct appeal from a FERC order. And the case has now gone back to FERC for determination of whether or not there were violations of the tariff. As the Solicitor General wrote in the brief in opposition to the cert petition in the law here case, those violations of tariff would be enforceable by FERC. So even that would be within FERC's exclusive jurisdiction, Judge Reimer. But I would further point out that as a factual matter, no one has ever established that PowerX failed to make the kinds of reports that FERC would be enforcing. But that would simply be a question of fact that FERC would be analyzing in the first instance. Thank you. All right. Thank you. Kelly. May it please the Court, on behalf of Public Service Company of New Mexico, I'm Bob Edwards. And I want to stress the substantial and contested nature of the Federal questions presented inherently by this complaint that warrant Federal preemption in addition to Federal jurisdiction. When FERC started its examination of these practices, it identified ricochet as potentially an illegal practice under their standards of the Federal Power Act, but then identified a whole series of circumstances where these transactions, they might actually find them to be lawful. They pointed out that some are not, in fact, fictitious transactions. Some work around transmission constraints. Some work around credit problems. And some allow marketers to participate in the real-time markets. Public Service Company of New Mexico is a traditional utility. It owns generation. It matches load the instant it occurs with its production. And it balances its load and its production second by second. It has participated in wholesale markets under market rate authority going back to the 80s, the first southwestern experiment. And then it joined, as the record of FERC showed, it joined the western system power pool in 91 and has operated under those tariffs ever since with no question about tariff compliance whatsoever. Before California opened up, PNM offered the generation coordination service that's called, quote, parking, unquote. It's not physical parking. It's not storing energy. It's not hiding energy. It allows a party that has bought energy on a forward basis, a standard forward product, to schedule that energy into a real utility system so that energy can be used real-time to match load as it's needed. What happened in California, the power exchange was supposed to deal with most of the requirements on a day-ahead or forward basis. In the real-time markets, there was supposed to be, as is true in a typical utility system, only about 5% of the energy fluctuating with load that needs to be bought real-time. And in that real-time market, it was thought that out-of-market purchases of power that had not previously been bought through auctions would be even a smaller percentage of that. Well, as you know, the power exchange didn't function as intended, and the real market had to go to the market more often. FERC, in addressing the type of service that PNM found, found it to be a helpful service, a service that enabled more parties to bid into the real-time markets, enabled parties to complete transactions that otherwise could not have been completed, and is a service that PNM offered non-discriminatorily to all comers. So the substantial issue has really been resolved very favorably from the standpoint of the market participants by FERC. For California to make the argument it is making, it has to support, it has to advance propositions that only FERC can decide. And the first one is this label, California Power. The power exchange bought power both from generators in California and from outside of California. California set it up in A.B. 1890, recognizing that it was a FERC institution in interstate commerce. So to the extent FERC wants to treat power exchange power as California power, that's a concept that Congress could enact. That's a concept that FERC can enact. But it's certainly not one that the states can enact. Certainly the state of New Mexico cannot declare that power at the Four Corners hub is New Mexico power, or Arizona say the power at Palo Verde is Arizona power. So it's a significant federal question. Public Service Company of New Mexico helped with the problem in California, and FERC found that it engaged in no improper conduct with respect to the level of rates and the ability of power. I sure see where there's a question in the mind of Californians to buy power in California and then sell it back to California at a higher price. I know. I know. And before this proceeding was instituted at FERC, when the ISO wanted to lower its price caps to try to procure power at lower prices, FERC acknowledged in approving that that, yes, but there are going to be more exports out of California because there are times  And that was acknowledged. That was acknowledged that would happen. The structure of these markets proved to be more complex than their authors anticipated, and we know that. And, yes, rates were too high, but the decision as to how much to lower them involves that classic balancing of consumer interests and the need to support Thank you. All right. Thank you, counsel. Mr. Park. I would just like to make three quick points. First, in terms of the issue about the tariff, whether Lockyer v. FERC made these tariffs invalid. First, Lockyer v. FERC did say that no rates were on file because of the dysfunctional market. Furthermore, FERC itself has looked at PowerX and found that it did not meet the reporting requirements, and that's something that Lockyer v. FERC has addressed and said the reporting requirements were integral to the tariff. So I would suggest that that is, in this case, it is still an unfiled tariff. Additionally, assuming the tariffs were not, were valid, could the classification of power issue still survive, even though it might be covered by the tariff? And Lippitt v. Raymond James and Grace Harbor are instructive on this issue, that if a misconduct overlaps or is prescribed by both the state statute and a federal regulation, what you have to look at is the enforcement. And Lippitt actually said enforcement is the key word. What are you trying to enforce? Are you trying to enforce the tariff or are you trying to enforce a state law? Grace Harbor is on the same point when it talks about the contract formation issue, that that could proceed in court and not FERC, that even though, that because of market manipulation, the contract was invalid, that's something that a court can determine. So, again, you can use the backdrop of things that might be covered by the tariff as long as you're not doing what FERC is doing, which is enforcing the tariff. And if I could just ---- Yeah, Mr. Park, your time has expired. Thank you. Thank you very much. Thank you all for your argument. The matter just argued will be submitted.
judges: Hug, Rymer, Rawlinson